**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Alcoa Community Federal Credit Union, on behalf of itself and all others similarly situated, | Civil Action No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FAIR ISAAC CORPORATION, | |
| Defendant. | |

Plaintiff brings this class action to challenge an anticompetitive scheme by defendant Fair Isaac Corporation ("Fair Isaac") to enhance and maintain Fair Isaac's monopoly power in the U.S. market for business-to-business credit scores ("B2B Credit Scores") in violation of the antitrust laws of the United States. Plaintiff purchased B2B Credit Scores directly from Fair Isaac or its co-conspirator agents, during the Class Period (defined below). Plaintiff brings this case on behalf of itself and a class of similarly situated direct purchasers of B2B Credit Scores, to recover overcharges resulting from the anticompetitive conduct alleged herein.

## INTRODUCTION

1.     Credit scores are derived from the application of algorithms to credit histories and are used for the purpose of assessing creditworthiness. There are two distinct domestic markets for credit scores: (1) the market for the sale of credit scores to lenders, financial institutions, and other businesses (the "B2B Credit Score Market"); and (2) the market for the sale of credit scores to consumers to monitor their own credit records (the "business-to-consumer" or "B2C Credit Score Market").

2.    Fair Isaac's FICO Credit Scores ("FICO Scores") have dominated the B2B Credit Score Market for decades. Fair Isaac stated in 2017 that it has "maintained a 90-plus percent market share for at least 13 years." Fair Isaac executives have stated that their FICO Scores are "the 800-pound gorilla" and are "deeply embedded in the system in North America." Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States.

3.    Fair Isaac has enjoyed monopoly power (*i.e.*, the power to control price or exclude competition) in the United States B2B Credit Score Market since at least 2006.  Fair Isaac has unlawfully maintained its monopoly power in the B2B Credit Score Market through anticompetitive and exclusionary agreements with TransUnion, Experian, and Equifax. TransUnion, Experian, and Equifax are the three dominant credit bureaus (collectively, the "Credit Bureaus") in the U.S.  They compile and sell information regarding consumer credit and on behalf of Fair Isaac, distribute to lenders, financial institutions, and other businesses Fair Isaac's FICO Scores.  The Credit Bureaus also distribute or sell competing B2B Credit Scores. Their ability to fairly and effectively do so, however, has been substantially impeded by anticompetitive contract terms imposed upon them by Fair Isaac.  These anticompetitive contract provisions have allowed Fair Isaac to obtain or maintain its monopoly power over the U.S. B2B Credit Score Market.

4.    More specifically, the Credit Bureaus have contracted with Fair Isaac in ways that restrain the Credit Bureaus' ability to develop or distribute competitive Credit Scores; prohibit the Credit Bureaus from individually negotiating royalty rates for access to FICO Scores; require that customers, such as Plaintiff, be charged discriminatory and prohibitively high Fair Isaac royalty rates if the customer also acquires  a competing Credit Score; and also requires that

an increased royalty rate be paid by the Credit Bureaus. The Credit Bureaus have agreed with Fair Isaac to these restraints.

5. The restraints set forth above were designed to impair, and have in fact impaired, Fair Isaac's competition in the U.S. These anticompetitive and exclusionary contract terms have impeded the ability of all purchasers to obtain B2B Credit Scores from Fair Isaac's competitors because they require the Credit Bureaus and the customer to incur substantial penalties if the Credit Bureau distributes to customers the B2B Credit Scores of Fair Isaac's competitors.

6. Fair Isaac has obtained and maintained its monopoly power by engaging in anticompetitive and exclusionary conduct including entering into the anticompetitive and exclusionary contract terms referenced above. Fair Isaac has suppressed competition, stymied innovation, and limited access to credit for millions of Americans – all in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), as well as numerous state antitrust and unfair trade practices laws.

7. In 2006, VantageScore Solutions, LLC ("VantageScore") launched a competitive Credit Score it called VantageScore. VantageScore was reliable, competitively priced, and highly predictive. Moreover, VantageScore has access to the Credit Bureaus' consumer data, which far exceeds the consumer data available to Fair Isaac. As a result, VantageScore maintains Credit Scores for 30 million domestic consumers who do not have FICO scores. VantageScore's product was more widely disseminated, millions of creditworthy consumers who now have restrained access to credit would have the opportunity to apply for mortgages, loans, or other forms of credit, and at a lower cost.

8. Fair Isaac responded to VantageScore's entry into the B2B Credit Score Market by engaging in anticompetitive conduct that has persisted for over more than a decade. In particular,

Fair Isaac restrained the Credit Bureaus' ability to distribute VantageScore, and publicly and falsely disparaged VantageScore's viability and reliability, so as to discourage B2B Credit Score consumers from purchasing VantageScore.

9.     Fair Isaac's anticompetitive and exclusionary conduct has prevented the sales growth and market penetration that VantageScore would have achieved through competition on the merits and discouraged whatever other competition would have emerged. As a result, Fair Isaac has been able to significantly raise the price that customers, such as the Plaintiff, paid for FICO scores.  But for Fair Isaac's suppression of competition and exclusionary contracts with the Credit Bureaus, VantageScore or another credit scoring system would have earned substantial market share, which would have resulted in lower prices for B2B Credit Scores for Plaintiff and members of the Class.

10.     On March 15, 2020, Fair Isaac disclosed that the Antitrust Division of the United States Department of Justice had opened an investigation based at least in part on the exclusionary conduct alleged herein.[1]

## JURISDICTION AND VENUE

11.     This action arises under sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and section 4 of the Clayton Act (15 U.S.C. § 15(a)) and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class (defined below) resulting from Fair Isaac's anticompetitive conduct. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

---

[1] *See* Press Release, Fair Isaac Corporation, FICO Statement Regarding Antitrust Investigation, https://www.prnewswire.com/news-releases/fico-statement-regarding-antitrust-investigation-301024452.html (Mar. 15, 2020).

12.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period, the Defendant resided, transacted business, was found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce discussed below has been carried out in this District.

13.    During the Class Period, Defendant sold B2B Credit Scores in a continuous and uninterrupted flow of interstate commerce, including in this District. Defendant's conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

14.    This Court has *in personam* jurisdiction over Defendant because it, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business throughout the United States, including in this District; (b) participated in the sale of B2B Credit Scores throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy or abuse of its monopoly power that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendant also conducts business throughout the United States, including in this District, and has purposefully availed itself of the laws of the United States.

15.    By reason of the unlawful activities alleged herein, Defendant substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class. Defendant, directly and through its agents, engaged in activities affecting all states, to restrict

5

output and fix, raise, maintain and/or stabilize prices in the United States for B2B Credit Scores, which unreasonably restrained trade and adversely affected the market for B2B Credit Scores.

16.    Defendant's unlawful conduct described herein adversely affected persons and entities in the United States who directly purchased B2B Credit Scores sold by Defendant, including Plaintiff and the members of the Class.

## THE PARTIES

17.    Plaintiff Alcoa Community Federal Credit Union is a Federal Credit Union with its principal place of business in Benton, Arkansas. Plaintiff makes loans and other credit-related facilities available to consumers. During the Class Period, Plaintiff directly purchased B2B Credit Scores from Defendant through a Credit Bureau. Plaintiff has been injured in its business or property as a proximate result of the unlawful conduct alleged herein.

18.    Defendant Fair Isaac Corporation is a Delaware corporation, with its principal place of business in San Jose, California.

## CREDIT BUREAUS

19.    Fair Isaac uses the Credit Bureaus to distribute its B2B Credit Scores to its customers. Fair Isaac's relationship with B2B Purchasers is, therefore, contractually interrelated with its relationships with the Credit Bureaus.

20.    When a B2B Purchaser requires a Credit Score, it purchases a report from a Credit Bureau, and the Credit Score jointly from Fair Isaac, distributed by the Credit Bureau. Although a single transaction may encompass both purchases, the sale of the Fair Isaac Credit Scores to B2B Purchasers is made by Fair Isaac.  In the alternative, the sale of the Fair Isaac Credit Scores is made jointly by both the Credit Bureau and Fair Isaac.

21. B2B Purchasers' contracts for FICO Scores are referenced as Credit Scoring Services Agreements ("CSSAs"). CSSAs provide for both the method of payment and fee model for the delivery of Credit Score services. They also establish the relationship between Fair Isaac and the B2B Purchasers.

22. For example, the CSSA between Plaintiff and its Credit Bureau, details performance due between Plaintiff and Fair Isaac. Plaintiff acknowledges that the FICO Scores are proprietary and the intellectual property of Fair Isaac, agrees not to reverse engineer the FICO Scores or Models, and agrees only to use them in the manner specifically permitted under the agreement, including requiring Plaintiff to explicitly obtain the approval of Fair Isaac for certain uses of the FICO Scores. Fair Isaac, in return, grants Plaintiff the limited license for the use of the FICO Scores, and issues representations and warranties that the scores are statistically sound and empirically derived. Finally, Plaintiff and its Credit Bureau explicitly agree that Fair Isaac has unconditional enforceable rights, which survive any termination of the agreement.

## FACTUAL ALLEGATIONS

### Credit Scores

23. Credit Scores are typically three-digit numbers that are designed to assess credit risk. Higher scores generally indicate that a consumer poses less credit risk. Credit Scores are produced using credit scoring systems that apply a credit scoring algorithm to a consumer credit report. Credit Scores are usually accompanied by "reason codes," which inform the lender about the reasons that contributed most significantly to reducing a particular consumer's Credit Score.

24. Credit Scores are the most widely used indicators of consumers' creditworthiness in the United States. Lenders, financial institutions, and other businesses rely on Credit Scores to decide whether and on what terms to extend credit to consumers. Consumers, in contrast, rely on

7

Credit Scores to determine whether they will be able to get a mortgage, credit card, auto loan, or other credit product and the rate they will pay.

25.    The Credit Bureaus collect and supply aggregated consumer credit data in the form of consumer reports. The Credit Bureaus continuously gather credit and financial data about consumers from creditors, governmental entities, public records, collection agencies, and other third parties. This information is then compiled into a "credit file." The Credit Bureaus sell credit reports, which include information gathered from a consumer's credit file, to businesses and consumers.

26.    While Credit Scores are sometimes sold together with credit reports, credit reports are different from Credit Scores and can be sold independently. A credit report is a statement that has detailed information about a consumer's credit activity and current credit situation. A consumer's credit report might, for example, include information about that consumer's history of mortgage payments, credit card balances, credit card payments, and credit inquiries. A Credit Score takes the detailed information in a credit report and turns it into a single three-digit number.

**Credit Score Markets**

27.    There are two distinct markets for Credit Scores in the United States: (1) the B2B Credit Score Market and (2) the B2C Credit Score Market. B2B and B2C Credit Scores are priced, purchased, and used very differently and serve very different purposes. The lenders, financial institutions, and other businesses in the B2B Credit Score Market that purchase and use Credit Scores to assess creditworthiness and make decisions about whether and on what terms to extend credit or otherwise take on risk do not consider credit reports, insurance scores, or any other information about borrowers, to be a substitute for Credit Scores.

28.    Consumers in the B2C Credit Score Market purchase their own Credit Scores to better understand their own creditworthiness and how they likely will be viewed by potential lenders.

29.    The United States is the relevant geographic market in which B2B Credit Scores are provided. The restraints on competition in the B2B Credit Score Market contained in Fair Isaac's contracts relate to the provision of B2B Credit Scores to businesses throughout the United States.

30.    Purchasers in the B2B Credit Score Market are comprised of lenders, financial institutions, and other businesses that purchase B2B Credit Scores in order to make risk management decisions ("B2B Purchasers"). Lenders, financial institutions, and other businesses that purchase Credit Reports from Defendant and/or the Credit Bureaus generally purchase Credit Scores in order to determine the credit-worthiness and identity of qualified borrowers to whom a preapproved credit offer will be extended ("pre-screening"), make lending decisions ("lending"), or review the risk associated with existing borrowers for purposes such as extending additional credit or changing other account terms ("account management").

31.    Customers in the B2C Credit Score Market, in contrast, purchase Credit Scores in order to manage their credit, protect their identity, or assess their likelihood of obtaining credit. Today, American consumers have signed up for over 160 million credit monitoring or identity protection accounts from businesses such as Capital One, Credit Karma, and LifeLock. Many of those accounts include access to the consumer's own Credit Score.

32.    The credit risk scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as distinct from the B2C Credit Score Market. Fair Isaac also regularly acknowledges that the B2B Credit Score Market is distinct from the B2C Credit

Score Market. For example, in its 2019 Form 10-K, Fair Isaac distinguished between its "business- to-business scoring solutions and services" and "business-to-consumer scoring solutions and services including myFICO solutions for consumers."

33. The B2B Credit Score Market is characterized by significant barriers to entry. B2B Purchasers encounter significant "switching costs" if they adopt a new Credit Score that has different score-to-risk relationships or that uses different reason codes – regardless of whether it is an updated version of the score they already use or an entirely new brand of Credit Score (unlike consumers in the B2C Credit Score Market). These switching costs arise because employees have to be trained in the properties and characteristics of a new score; B2B Purchasers must ensure that the new score will be adequately predictive of the creditworthiness of their own customer base; B2B Purchasers often conduct extensive, costly, and time-consuming validation tests to determine whether the new score is cost-effective; and B2B Purchasers may need to invest in updating their internal systems to ensure technical compatibility between those systems and a new score.

34. Network effects also characterize the B2B Credit Score Market. For example, in the mortgage and auto loan industries the consistent use of particular Credit Scores with similar score-to-risk relationships and reason codes facilitates the bundling of large groups of mortgage and auto loans from different originators into securities that can be sold to investors. Because of the consistent use of a single type of Credit Score, marketing materials for these securities can include data on the average and stratified Credit Scores of the borrowers associated with the underlying loans.

**Fair Isaac's Monopoly Power**

35.   Fair Isaac has maintained monopoly power over the B2B Credit Score Market in the United States for roughly three decades, largely through the unlawfully achieved dominance of its FICO product line, which includes many different types of FICO Scores. Introduced in the 1980s, Fair Isaac's "FICO Classic" Credit Scores are the best known and most widely used B2B Credit Scores in the United States. FICO Classic applies an algorithm to each Credit Bureau's data and generates a score between 300 and 850 that purports to be an indicator of the individual's credit risk. It also generates a set of "reason codes" that explain the reasons the consumer has not been assigned the maximum score.

36.   Fair Isaac advertises its monopoly share of the B2B Credit Score Market. On its website, Fair Isaac advertises: 10 billion FICO Scores are sold each year, which is four times the number of hamburgers that McDonald's sells worldwide each year; 27.4 million FICO Scores are sold every day, which is over twice the number of cups of coffee Starbucks sells worldwide in a day; and 90% of all lending decisions in the United States rely on FICO Scores.

37.   Similarly, in its 2019 Form 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used . . . by nearly all of the major banks, credit card organizations, mortgage lenders, and auto loan originators."

38.   Fair Isaac representatives have described Fair Isaac's FICO score as "the 800-pound gorilla" in the market for B2B Credit Scores and bragged about Fair Isaac's 90% market share. For example, in November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President, Michael Pung, stated that Fair Isaac's FICO Scores are:

11

- The "most widely used credit scoring system here in the U.S.";

- Used by "[v]irtually every major lender in the U.S."; and that

- Fair Isaac has "maintained a 90-plus percent market share for at least . . . 13 years."

39. Fair Isaac representatives have also recognized that FICO Scores have benefited from the network effects created by the widespread use of FICO Scores in many industries. For example, in November 2011, then-CEO of Fair Isaac, Mark Greene, explained that the "network effect" of "FICO Scores . . . being sort of the standard language" and "having everybody . . . standardize on a FICO Score, that's magic."

40. Fair Isaac's monopoly position in the B2B Credit Score Market for Credit Scores has given it the power to control prices. Indeed, Fair Isaac's CEO, Will Lansing, has noted that in the B2B Credit Score Market Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are." Fair Isaac's monopoly position has also given it the power to exclude competition from competitors, such as VantageScore.

**Fair Isaac's Anticompetitive and Exclusionary Conduct**

41. In March 2006, VantageScore introduced the VantageScore Credit Score and credit scoring system. VantageScore is a competitor to FICO Scores in the B2B Credit Score Market.

42. From the time it was first released in 2006, VantageScore scored millions more consumers than the FICO scoring systems. Whereas Fair Isaac's FICO scoring systems would not generate a score if a consumer had not used credit in more than six months or if a credit account was fewer than six months old, VantageScore calculated scores for consumers that had not used credit for up to two years. It also reached more consumers by using utility and telecommunications payment histories when reported to the Credit Bureaus.

43.   Today, VantageScore scores 30 million more Americans than traditional FICO scoring systems. Fair Isaac's outdated FICO Classic credit scoring systems – which are still used by many lenders – exclude many creditworthy Americans that VantageScore can reliably score. About one-quarter of American adults – some 65 million people – do not have a traditional FICO score. VantageScore is capable of reducing the number of adults without a Credit Score by almost half. Ten million of those newly scored individuals are "prime" borrowers that should be attractive to traditional lenders.

44.   Without a Credit Score, it is difficult or impossible to apply for or successfully obtain a mortgage, car loan, or reasonable interest rates on personal lines of credit. Not having a Credit Score can also have drastic effects outside of the credit market. For example, Credit Scores are increasingly used by landlords to screen potential tenants.

45.   Those excluded by Fair Isaac's traditional FICO scoring systems – who face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and apartment housing – include disproportionate numbers of low-income and minority consumers.

46.   Indeed, one advocacy group focused on making it possible for people with limited incomes, especially people of color, to achieve financial security has observed: "Black and Hispanic individuals are . . . significantly more likely than white individuals to be credit invisible" – meaning that they have "no established credit history," are "unscored," and "lack[] sufficient or recent enough credit history to be given a [FICO] Credit Score." VantageScore calculates a score for 9.5 million Hispanic and Black consumers who do not have a FICO score, including 2.7 million minority consumers who should be considered "prime" borrowers.

47.     Despite the potential advantages of using VantageScore, Fair Isaac continues to maintain its monopoly and monopoly power in the B2B Credit Score Market. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO, Will Lansing, explained that despite the existence of VantageScore, "there [is] not that much competition around our [B2B] scores business" because "FICO scores are very much part of the fabric of the banking industry" and "really deeply imbedded."

48.     Fair Isaac has used its monopoly power to coordinate a multi-faceted campaign to prevent and eliminate competition from VantageScore and/or other competitors. Fair Isaac has been explicit that this is its goal. In April 2015, Will Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO scores instead of [other] scores." To achieve this goal, Fair Isaac has enlisted the Credit Bureaus to agree to anticompetitive contract terms that: prevent them from developing or selling alternative Credit Scores that could be seamlessly integrated into many lenders' systems or used interchangeably with FICO Scores; prevent them from competing with each other to negotiate better terms from FICO; and create a pricing scheme that effectively forecloses B2B Purchasers from choosing to use FICO Scores in their lending decisions at the same time as providing customers with a competing Credit Score, including VantageScore. Fair Isaac also has waged a media campaign against VantageScore that makes false and misleading statements about the quality and reliability of VantageScore's Credit Score product. By its anticompetitive and exclusionary conduct, Fair Isaac has injured competition in the B2B Credit Score Market, increased prices for Plaintiff and the Class, and limited access to credit for millions of consumers.

### *Exclusion of Other Credit Scores*

49.    Fair Isaac has imposed a similar or identical No Equivalent Products clause on each of the Credit Bureaus. By imposing a No Equivalent Products term, Fair Isaac has sought to block the Credit Bureaus from offering alternative Credit Score products, such as VantageScore, that would allow B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems, or to use VantageScore alongside or interchangeably with FICO Scores. The Credit Bureaus have agreed to these anticompetitive terms, with the resulting anticompetitive effects.

50.    The No Equivalent Products clause provides that a Credit Bureau may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any Fair Isaac Analytic or that uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. It also prohibits a Credit Bureau from distributing any competing analytic (i.e., credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes, and the clause expressly names VantageScore Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

51.    For example, if a competing Credit Score product used a 700 score to indicate a less-than-five-percent risk of credit delinquency, and if a 700 FICO score also indicated the same risk of delinquency, then the No Equivalent Products clause prevents a Credit Bureau from distributing the competing product. Similarly, if a competing Credit Score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the No Equivalent Products clause prohibits a Credit Bureau from distributing the product.

52. The No Equivalent Products clause effectively prevents a Credit Bureau from developing (contrary to the original goal of VantageScore and the easy ability to do so) or selling an alternative to FICO's Credit Scores that would (i) be compatible with many B2B Purchasers' systems, models, and processes; and (ii) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score. Many B2B Purchasers have spent substantial effort and resources to develop systems, models, and processes that are designed for FICO Scores. B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship (i.e., each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

53. The No Equivalent Products clause protects and sustains Fair Isaac's monopoly power. The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property. Similarly, the reason codes that may not be used by an Equivalent Product were not invented by Fair Isaac but reflect well-established industry best practices for lending.

### *Bundling and Penalty Pricing*

54. Fair Isaac's contracts with each Credit Bureau include a similar or identical Dynamic Royalty Schedule clause and a similar or identical Pre-Qualification royalty category. Through the Pre-Qualification royalty category, Fair Isaac has effectively foreclosed lenders from purchasing and using a FICO score in their lending decision while also providing a consumer with a competing Credit Score, which drives lenders to exclusively purchase Fair

16

Isaac's FICO Scores and not purchase competing Credit Scores. As a consequence of Fair Isaac's imposition of the Pre-Qualification royalty category, VantageScore has lost sales of Credit Scores to major banks to provide to consumers.

55.    In 2015, Fair Isaac and the Credit Bureaus agreed to a new Pre-Qualification royalty category, which Fair Isaac defines as an End User's qualification of a potential consumer customer for an End User's own internal lending offering. This royalty category distinguishes between: (1) lenders that use FICO Scores for Pre- Qualification without providing any Credit Score or credit data to consumers; and (2) lenders that use FICO Scores for Pre-Qualification while also providing Credit Scores or credit data to consumers in connection with the Pre-Qualification. Certain banks and lenders offer consumers opportunities to apply to qualify for credit opportunities (e.g., a credit card or loan) and, at the same time, receive their personal Credit Score. The offer of a free Credit Score to a consumer can entice consumers to apply for credit opportunities.

56.    The royalty price associated with a FICO score used for Pre-Qualification depends on whether other Credit Scores or credit data are provided to consumers. If a lender purchases a FICO score for use in Pre-Qualification and does not provide any Credit Score or credit data to the consumer "in connection" with the Pre-Qualification, there is one per-score royalty rate. If the lender purchases a FICO score for use in Pre-Qualification and provides any other Credit Score (such as a VantageScore) to the consumer in connection with the Pre- Qualification, there is a different per-score royalty rate that is higher – a penalty rate.

57.    The penalty rate can be avoided in one of two ways, both of which involve purchasing exclusively FICO Scores. First, the B2B Purchaser could purchase a FICO score for use in "Pre-Qualification" and provide no Credit Score or credit data to the consumer. Second,

the B2B Purchaser could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders with the provision of scores to consumers.

58.    There is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and the Credit Bureaus when the lender also purchases any other Credit Score to disclose to consumers. The transparent purpose of the Pre-Qualification royalty category is to drive all B2B Purchasers engaging in Pre-Qualification to purchase exclusively FICO Scores and make it cost-prohibitive for B2B Purchasers engaging in Pre-Qualification to purchase a competing Credit Score for disclosure to consumers. This scheme has been effective, and few, if any, B2B Purchasers have opted to pay the penalty rate.

### Fair Isaac's Prices are Supracompetitive

59.    Fair Isaac's Level Playing Field requires that pricing made available to one Credit Bureau be made available to the other Credit Bureaus. Taken together, the Dynamic Royalty Schedule and the Level Playing Field clauses enable Fair Isaac to increase above the competitive level the royalty prices it charges for FICO Scores. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical Level Playing Field and Dynamic Royalty Schedule provisions.

60.    Fair Isaac has used the Level Playing Field and Dynamic Royalty Schedule provisions in its contracts with the Credit Bureaus to extract supracompetitive monopoly prices from B2B Purchasers. These provisions disincentivize a Credit Bureau from negotiating for lower pricing terms because each knows that even if it succeeds, it will not gain a competitive advantage over the other Credit Bureaus.

*Fair Isaac's Disparagement of VantageScore*

61.    Despite having successfully induced the Credit Bureaus to agree with Fair Isaac to restrain VantageScore's ability to compete with FICO, Fair Isaac has gone further and has waged an aggressive campaign to spread false and disparaging statements about VantageScore and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore by calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented the information considered by VantageScore's credit scoring system.

62.    On December 12, 2017, Fair Isaac took out a full-page advertisement in The Wall Street Journal addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative Credit Score, which is "owned by the credit bureaus," is less reliable than FICO Scores in evaluating credit risk, and fails to use "sound practices" or "science-based credit evaluation." To anyone familiar with the market for Credit Scores, the advertisement unambiguously conveys the false message that VantageScore is "[w]eakening scoring standards, [and] harm[ing] consumers, and the lending system," particularly in the B2B Credit Score Market.

63.    The Wall Street Journal advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post asserts: "Despite claims by

VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

64. Moreover, the implication that FICO Classic scoring systems provide Credit Scores for as many consumers as VantageScore is false and misleading. VantageScore provides Credit Scores for millions of American consumers that are not scored by FICO Classic scoring systems.

65. Fair Isaac's website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features. For example, one blog post claims that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This statement is false and misleading because it conveys the message that VantageScore's scoring model is "weak" and does a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore is strongly predictive.

66. Another blog post claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not." This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones.

67. Fair Isaac's campaign against VantageScore is not new. In 2006, just months after the launch of VantageScore, Fair Isaac filed a meritless lawsuit against the Credit Bureaus and VantageScore in the United States District Court for the District of Minnesota. See Fair Isaac Corporation v. Equifax Inc., No. 06-cv-04112 (D. Minn.). This was the monopolist's first

attempt to kill the nascent competitor. Fair Isaac's numerous claims included a claim that the development of VantageScore violated the antitrust laws and a claim that the development of VantageScore constituted trademark infringement. In its prayer for relief, Fair Isaac sought nothing less than the end of VantageScore: it requested that the "Defendants be ordered to dissolve VantageScore."

68.    All of Fair Isaac's claims failed. In fact, the jury concluded that Fair Isaac was the wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it was similar to FICO's scoring range of 300-850. The Credit Bureaus and VantageScore counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range. The jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as part of its application to register the score range of 300-850 as a trademark.

69.    The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

### *Harm to Competition*

70.    Fair Isaac's campaign of anticompetitive and exclusionary conduct to maintain and expand its monopoly power has harmed and continues to harm competition and participants in the B2B Credit Score Market. Fair Isaac's unlawful conduct, including that which has been taken in concert with the Credit Bureaus, has foreclosed competition in the B2B Credit Score Market by restraining the Credit Bureaus from selling VantageScore or any other competitive products. The anticompetitive and exclusionary conduct has allowed Fair Isaac to maintain its monopoly

power and charge supracompetitive monopoly prices for B2B Credit Scores to B2B Purchasers during the Class Period.

71.   Fair Isaac's conduct, in concert with the Credit Bureaus, has reduced choice for B2B Purchasers. The anticompetitive terms to which Fair Isaac and the Credit Bureaus agreed have frustrated the ability of B2B Purchasers to purchase VantageScore or any other competitive Credit Score that could be seamlessly integrated into lenders' existing processes and systems. Fair Isaac's disparagement campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace and has resulted in fewer sales by VantageScore and a lesser degree of competition from VantageScore.

72.   Media sources, financial blogs, and consumers have absorbed Fair Isaac's false and disparaging message that VantageScore is a "Fako" score merely because it is not a FICO score. For example, thebalance.com – a website devoted to personal finance issues – posted in February 2017, and continues to display as of the date of this filing: "If you purchased your Credit Score anywhere but MyFICO.com, then it's a Fako score."

## FRAUDULENT CONCEALMENT AND TOLLING

73.   A cause of action accrued for Plaintiff each time Fair Isaac and/or a Credit Bureau sold a B2B Credit Score to plaintiff at a supracompetitive price made possible by their anticompetitive conduct. Each such sale constituted an overt act in furtherance of their anticompetitive scheme. Accordingly, Plaintiff is entitled to recover all damages on all sales that Fair Isaac and/or its co-conspirators made to Plaintiff at supracompetitive prices within four years of the filing of this action.

74.   Due to Fair Isaac's concealment of its unlawful conduct, however, Plaintiff and members of the Class are entitled to recover damages reaching back even beyond the four-year

statute of limitations period. Fair Isaac's violations were not reasonably discoverable until February 12, 2018, when TransUnion disclosed the misconduct in a suit against Fair Isaac. Plaintiff and members of the Class had no knowledge of the unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this action.

75.    That is true, at least in part, because the nature of the scheme was self-concealing and because Fair Isaac employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, its scheme.

76.    Because the scheme was both self-concealing and affirmatively concealed by Fair Isaac, Plaintiff and members of the Class had no knowledge of the scheme more than four years before the filing of this complaint; nor did they have the facts or information that would have caused a reasonably diligent person to investigate.

77.    Plaintiff and members of the class also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence on the part of Plaintiff and members of the class would not have uncovered those facts more than four years before the filing of this complaint.

78.    As a result of Fair Isaac's fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and class members' claims have been tolled.

79.    The federal government's antitrust investigation of Fair Isaac's unlawful conduct also tolls any federal statute of limitations pursuant to 15 U.S.C. § 16.

## CLASS ALLEGATIONS

80.   Plaintiff brings this action on behalf of itself and all others similarly situated

pursuant to Rule 23 of the Federal Rules of Civil Procedure as representative of a class (the

"Class") defined as follows:

> All persons or entities in the United States and its territories that purchased B2B
> Credit Scores directly from Fair Isaac and/or a Credit Bureau, or any of their
> respective divisions, subsidiaries, predecessors, or affiliates, during the period
> from January 1, 2006, through such time as the effects of Fair Isaac's illegal
> conduct have ceased, and excluding all governmental entities, Fair Isaac, and Fair
> Isaac's divisions, subsidiaries, predecessors, and affiliates.

81.   On information and belief, hundreds or thousands of entities in the U.S. have

purchased B2B Credit Scores directly from Fair Isaac and/or its co-conspirators, the Credit

Bureaus. Thus, the Class is so numerous that joinder is impracticable.

82.   Plaintiff's claims are typical of those of the Class.

83.   Plaintiff and all members of the Class were injured in the form of overcharges by

the same conduct of the Defendant.

84.   Plaintiff will fairly and adequately protect and represent the interests of the Class.

The interests of the Plaintiff are not antagonistic to the Class.

85.   Plaintiff is represented by counsel who are experienced and competent in the

prosecution of complex class action antitrust litigation.

86.   Questions of law and fact common to the members of the Class predominate over

questions, if any, that may affect only individual members because Fair Isaac has acted and

refused to act on grounds generally applicable to the entire Class. Such generally applicable

conduct is inherent in Fair Isaac's exclusionary and anticompetitive conduct in monopolizing and

attempting to monopolize the B2B Credit Score Market, as more fully alleged herein.

87.   Questions of law and fact common to the Class include:

a.  whether Fair Isaac intentionally and unlawfully impaired or impeded competition in the B2B Credit Score Market;

b.  whether Fair Isaac maintained or enhanced monopoly power in the B2B Credit Score Market through anticompetitive or exclusionary conduct;

c.  whether Fair Isaac engaged in anticompetitive conduct in order to unlawfully disadvantage its competitors and maintain monopoly power in the B2B Credit Score Market;

d.  whether Fair Isaac had and has monopoly power in the B2B Credit Score Market;

e.  whether Fair Isaac had any legitimate, procompetitive reasons for its conduct;

f.  the effects of Fair Isaac's anticompetitive conduct on in the B2B Credit Score prices;

g.  whether Plaintiff and other members of the Class have been overcharged and thus damaged by paying artificially inflated prices for B2B Credit Scores as a result of Fair Isaac's unlawful behavior; and

h.  the proper measure of damages.

88.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

25

89. Plaintiff knows of no difficulty to be encountered in the maintenance of this action as a class action.

## CLAIMS FOR RELIEF

### COUNT 1
### Violation of Section 2 of the Sherman Act: Monopolization

90. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

91. The relevant product market is the market for the sale of B2B Credit Scores.

92. The relevant geographic market for the sale of B2B Credit Scores is the United States.

93. The B2B Credit Score Market in the United States is the relevant market.

94. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States.

95. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

96. Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

97. Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Scores in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

98. Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

99. Fair Isaac's monopoly power is not due to growth or development because of a superior product, business acumen, or historic accident.

100. Fair Isaac's acts of monopolization have injured and will continue to injure competition in the relevant market.

101. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

102. The anticompetitive conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

103. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

104. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**COUNT 2**
**Violation of Section 2 of the Sherman Act: Conspiracy to Monopolize**

105. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

106. The relevant product market is the market for the sale of B2B Credit Scores.

107. The relevant geographic market for the sale of B2B Credit Scores is the United States.

108. The B2B Credit Score Market in the United States is the relevant market.

109. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

110. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

111. Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

112. Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

113. Fair Isaac combined, conspired or agreed with the Credit Bureaus so as to maintain its monopoly power in the B2B Credit Score Market. Fair Isaac created and maintained this conspiracy through a series of agreements with the Credit Bureaus. In these agreements, the Credit Bureaus and Fair Isaac agreed that the Credit Bureaus would not offer or sell VantageScore or any other competing Credit Score to Plaintiff and members of the Class. Fair Isaac and the Credit Bureaus further agreed that the Credit Bureaus would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiff and members of the Class.

114. These agreements foreclosed competition in a substantial portion of the B2B Credit Score Market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO Scores from Plaintiff and members of the Class.

115. Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

116. Fair Isaac's conspiracy to monopolize has injured and will continue to injure competition in this market.

117. Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

118. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

119. The conspiracy raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

120. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

121. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**COUNT 3**
**Violation of Section 2 of the Sherman Act: Attempt to Monopolize**

122. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

123. Fair Isaac's actions as alleged herein constitute attempted monopolization in violation of Section 2 of the Sherman Antitrust Act.

124. Fair Isaac's activities as alleged herein were and are within the flow of interstate and foreign commerce and have substantially adversely affected interstate and foreign commerce.

125. The relevant product market is the market for the sale of B2B Credit Scores.

29

126. The relevant geographic market for the sale of B2B Credit Scores is the United States.

127. The B2B Credit Score Market in the United States is the relevant market.

128. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States.

129. Fair Isaac's conduct was specifically intended to acquire monopoly power in the relevant market. Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

130. There is a dangerous probability that Fair Isaac will succeed in obtaining monopoly power in the relevant market.

131. Fair Isaac's monopoly power is not due to growth or development because of a superior product, business acumen, or historic accident.

132. Fair Isaac's attempt to monopolize has injured and will continue to injure competition in this market.

133. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's attempt to monopolize the relevant market.

134. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## COUNT 4
### Violation of Section 1 of the Sherman Act: Unreasonable Restraint of Trade

135. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

136. The relevant product market is the market for the sale of B2B Credit Scores.

137. The relevant geographic market for the sale of B2B Credit Scores is the United States.

138. The B2B Credit Score Market in the United States is the relevant market.

139. Fair Isaac had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States.

140. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

141. Fair Isaac has had and continues to have the power to control prices or exclude competition in the relevant market.

142. Fair Isaac entered into agreements with TransUnion, Experian, and Equifax that contained anticompetitive and exclusionary terms whereby each Credit Bureau agreed not to offer or sell VantageScore as a competing product to Plaintiff and members of the Class.

143. The agreements between Fair Isaac and the Credit Bureaus had substantial anticompetitive effects. The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

144. The agreements raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

145. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

146. Plaintiff and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac does not cease its anticompetitive conduct.

147. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

148. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## COUNT 5
## Violations of State Antitrust Laws

149. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

150. By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the antitrust laws of the States of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

 a. Arizona Revised Statutes § 44-1401, *et seq.*;

 b. California Cartwright Act, California Business & Professions Code § 16700, *et seq.*;

 c. Connecticut Antitrust Act, Conn. Gen. Stat. 35-24, *et seq.*;

 d. District of Columbia Code § 28-4501, *et seq.*;

 e. Hawaii Revised Statutes § 480-2, *et seq.*;

 f. Illinois Antitrust Act, Illinois Complied Statutes § 740, Ill. Comp. Stat. 1011, *et seq.*;

 g. Iowa Competition Law, Iowa Code § 553.1, *et seq.*;

 h. Kansas Statutes Annotated § 50-101, *et seq.*;

 i. Maine Revised Statutes Annotated, tit. 10, § 1101, *et seq.*;

j.  Maryland Code Annotated, Commercial Law, § 11-204, *et seq.*;

k.  Michigan Compiled Laws § 445.771, et seq.;

l.  Minnesota Antitrust Law of 1971, Minnesota Statutes § 325D.49, *et seq.*;

m.  Mississippi Code Annotated § 75-21-1, *et seq.*;

n.  Nebraska Revised Statutes § 59-801, *et seq.*;

o.  Nevada Revised Statutes Annotated § 598A.010, *et seq.*;

p.  New Mexico Statutes Annotated § 57-1-1, *et seq.*;

q.  New York Donnelly Act, New York General Business Law § 340, *et seq.*;

r.  North Carolina General Statutes § 75-1, *et seq.*;

s.  North Dakota Century Code § 51-08.1-01, *et seq.*;

t.  Oregon Revised Statutes § 646.705, *et seq.*;

u.  Rhode Island General Laws § 6-36-4, *et seq.*;

v.  South Dakota Codified Laws § 37-1-3.1, *et seq.*;

w.  Tennessee Code Annotated § 47-25-101, *et seq.*;

x.  Utah Code Annotated § 76-10-3104, *et seq.*;

y.  Vermont Statutes Annotated, tit. 9, § 2451, *et seq.*;

z.  West Virginia Code § 47-18-1, *et seq.*; and

aa. Wisconsin Statutes § 133.01, *et seq.*

**COUNT 6**
**Violation of State Unfair Trade Practices Laws**

151.  Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

152.  By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the Unfair Trade Practices and Consumer Protection Laws

33

of the States of Arkansas, California, Connecticut, Florida, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, and Vermont, as well as the District of Columbia, as follows:

    a.  Arkansas Code Annotated, § 4-88-101, *et seq.*;

    b.  California Business and Professions Code § 17200, *et seq.*;

    c.  Connecticut Unfair Trade Practices Act, Conn Gen. Stat. § 42-110a, *et seq.*;

    d.  District of Columbia Code § 28-3901, *et seq.*;

    e.  Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*;

    f.  Massachusetts Consumer Protection Act, Mass. Gen. L. Ch. 93A, *et seq.*;

    g.  Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

    h.  Montana Code, § 30-14-103, et seq., and § 30-14-201, *et seq.*;

    i.  New Mexico Statutes Annotated § 57-12-1, *et seq.*;

    j.  New York General Business Law § 349, *et seq.*;

    k.  North Carolina General Statutes § 75-1.1, *et seq.*;

    l.  Rhode Island General Laws § 6-13.1-1, *et seq.*;

    m.  South Carolina Code Annotated § 39-5-10, *et seq.*; and

    n.  Vermont Statutes Annotated, tit. 9, § 2451, *et seq.* .

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    The Court determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.     The conduct alleged herein be declared, adjudged, and/or decreed to be unlawful under Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

C.     Plaintiff and the Class recover their overcharge damages, trebled, and the costs of the suit, including reasonable attorneys' fees as provided by law; and

D.     Plaintiff and the Class be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiff demands trial by jury of all issues so triable.

Dated: April 27, 2020               Respectfully submitted,

                       */s/ Paul E. Slater*
Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
SPERLING & SLATER
55 West Monroe Street
Suite 3200
Chicago, IL 60603
(312) 641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Bart D. Cohen
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
(917) 438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
ROBERTS LAW FIRM, P.A.
20 Rahling Circle
Little Rock, AR 72223
(501) 821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

*Counsel for Plaintiff Alcoa Community
Federal Credit Union and the Proposed Class*